**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMES NAPOLI, | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-02872-JLR |
| META PLATFORMS, INC., | **AMENDED COMPLAINT** |
| Defendant. | Jury Trial Demanded |

Plaintiff JAMES NAPOLI, by his attorneys C.A. Goldberg PLLC and Peter Romer-Friedman Law PLLC, brings this action against Defendant META PLATFORMS INC. ("Meta") and alleges as follows:

**INTRODUCTION**

1.      This is a case about one of the most sophisticated global technology companies in history failing at its most fundamental duty—to keep dangerous people out of its workplace and protect its employees from known harassers and stalkers.

2.      Founded in 2004, Facebook, now known as Meta Platforms, owns and operates some of the world's most popular social media applications including Facebook, Instagram, and WhatsApp.

3.      Each day, Meta accesses the personal data of 3.27 billion daily active users around the world, monitoring what ordinary people do and say on its platforms and elsewhere.

4.      As of December 31, 2023, Meta employed more than 67,000 employees around the world in approximately 90 cities.

5. Meta is constantly reshuffling its teams, laying people off, re-hiring former employees and contractors, transferring professionals from one location to another, and reassigning employees to other teams. Often professionals start working for Meta through a contractor and then migrate to direct employment with Meta, and in other cases they transition from direct employment at Meta to working through a contractor, despite doing the same type of work in the same physical offices.

6. For operational reasons or to appease investors on Wall Street, Meta often terminates its workers, leaving them abruptly jobless, shocked, disoriented, and sometimes prone to mental health crises.

7. Meta maintains a large Human Resources Department and Corporate Security Department that are supposed to investigate and respond to employees' complaints about discrimination, harassment, and threats to their security. Despite this and despite being a leader in technology who controls vast amounts of sensitive data about billions of people, Meta lacks the basic ability to keep track of who works for the company and to stop *known* dangerous individuals from being hired or re-hired by the company. And even worse, Meta apparently has no problem hiring an employee that Meta knows has savagely stalked and sexually harassed a current Meta employee.

8. The case of James Napoli illustrates that Meta is either incompetent or deliberately indifferent when it comes to protecting its employees from harassers and stalkers.

9. On November 9, 2022, during a massive layoff of 11,000 Meta employees, Meta notified an employee, G.F., who had worked in Meta's New York City office, that he would be among thousands of other employees who would be laid off, and that his employment would end 90 days later on or around February 7, 2023.

10.     Soon after G.F. was notified that he would be terminated, but while he was still employed by Meta, G.F. began actively and aggressively stalking and sexually harassing his former work acquaintance, James Napoli, having monitored Mr. Napoli since April 2022.

11.     Mr. Napoli did the right thing and quickly reported G.F.'s sexual harassment and stalking, including romantic, sexual, and lewd communications, to Meta to protect himself and other Meta employees from this dangerous person, who, at the time, was still employed by and under the control of Meta.

12.     Meta's Human Resources Department and Security Department met with Mr. Napoli, took reports about G.F., collected hundreds of pages of G.F.'s sexual and religious rantings to Mr. Napoli, and advised Mr. Napoli about reporting the stalking to law enforcement. But Meta did not take any action to stop G.F. from continuing to sexually harass or stalk Mr. Napoli while he continued to be employed by Meta, despite the fact that Meta was continuing to employ, pay, and provide benefits to G.F. and Meta had the ability to control G.F.'s conduct. As a result, G.F. continued to sexually harass and stalk Mr. Napoli while G.F. was still employed by Meta, including by sending Mr. Napoli unwelcome communications that were sexual and romantic in nature. Because Meta failed to take any steps to stop G.F. from continuing to sexually harass and stalk Mr. Napoli while he was still employed by Meta, Meta is liable for sexual harassment that occurred during G.F.'s continued employment with Meta.

13.     On March 14, 2023, Meta's CEO Mark Zuckerberg issued an "Efficiency Update" notice to Meta's staff informing them that the company would be reducing its hiring rates and eliminating 10,000 people. Zuckerberg said, "I've made the difficult decision to further reduce the size of our recruiting team."

14.     Meanwhile, G.F.'s stalking and harassment of Mr. Napoli did not stop. And after enduring this harassment for almost a year, in September 2023, Mr. Napoli told Meta's Human Resources and his interim manager that the stalking was increasing "in both frequency and severity." ("This morning alone I've received nearly 20 disturbing messages, texts, calls, voicemails, and emails which also contain threats against me, my partner and now my dog"). And he explained that G.F. had apparently discovered where Mr. Napoli lived and had delivered disturbing messages to his home.

15.     Meta's Human Resources Department assured Mr. Napoli that G.F. was on Meta's "Do Not Hire" list and "No Entry" list. Mr. Napoli made several reports to the New York City Police Department ("NYPD"), but the NYPD took no action. Meta also suggested to Mr. Napoli that he petition for an order of protection, oblivious to the fact that in New York State such orders are only available to people who have an intimate relation to their stalker (which Mr. Napoli never had with G.F.).

16.     On January 23, 2024, Mr. Napoli was shocked and sickened to see G.F.'s name pop up on Workplace, Meta's internal platform for its employees to communicate with each other. G.F. messaged Mr. Napoli that he had been re-hired and would be seeing Mr. Napoli at meetings and events.

17.     Mr. Napoli reported the shocking and disturbing news to Meta's Human Resources Department, which admitted that, to its own surprise, G.F. had indeed been re-hired and returned to work for Meta on January 8, 2024.

18.     Until Meta notified Mr. Napoli that G.F. was terminated on February 9, 2024, Mr. Napoli lived in terror of interacting with G.F. at work, fearing for his physical safety and

emotionally distraught that his sexual harasser and stalker once again had physical access to where he was working.

19.     Because of the second termination—for which G.F. blamed Mr. Napoli—G.F.'s stalking and harassment of Mr. Napoli significantly amplified and became more creative, sexually violent, and obsessive.

20.     Mr. Napoli has experienced profound distress, including physically, emotionally, and professionally, as a result of Meta's subjecting him to G.F.'s stalking and harassment that began in November 2022 during G.F.'s final months of employment at Meta and continued through February 2023 and thereafter, assuring Mr. Napoli that he was safe from G.F.'s stalking and harassment at Meta's workplace, and then re-hiring G.F. and thereby re-subjecting Mr. Napoli to G.F.'s more vengeful and amplified stalking and harassment.

21.     Meta's employment practices are apparently so chaotic, reckless, and ineffectual that the company fails to keep track of the most fundamental data point in its workplace – the dangerous people who pose a severe risk to Meta's own employees. Yet Meta tells the public and public officials that the company has the ability to safeguard the personal data of billions of children and adults on their platforms.

22.     As this case illustrates, Meta's notorious "move fast and break things" ethos is mirrored in Meta's own workplace, such that Meta would rehire a person, despite Meta having actual knowledge of this person's extensive history of sexually harassing and stalking Mr. Napoli, his Meta co-worker (and then-current Meta employee), during his prior employment with Meta and after his prior employment, and subject all of its employees to that dangerous individual.

23.     In addition to failing to carry out its most basic duty to protect its employees from a known stalker and sexual harasser who had sexually harassed and stalked a co-worker during his

prior employment with Meta, Meta has retaliated against Mr. Napoli for complaining to his managers and Human Resources about G.F.'s sexual harassment and stalking and Meta's subsequent re-hiring of G.F., which amplified G.F.'s sexual harassment and stalking of Mr. Napoli. For instance, Meta reduced Mr. Napoli's responsibilities, sidelined him from meaningful projects, took away other opportunities to work on campaigns, and gave him a negative performance evaluation in August 2024 that did not accurately reflect his true performance. And ultimately, on February 10, 2025, Meta terminated Mr. Napoli's employment while Mr. Napoli was on medical leave to address physical health conditions that were exacerbated due to Meta's prior negligence and civil rights violations.

24.     For ordinary professionals like Mr. Napoli, Meta disregards the most basic standards of workplace violence prevention—the cardinal rule being not to welcome back known dangerous people into the workplace. However, when it comes to its senior leaders, Meta spares no expense to protect them from threats at all times, spending millions of dollars to protect executives and other senior leaders and taking any threat deadly seriously.

25.     This action seeks to hold Meta accountable for discrimination in the terms and conditions of Mr. Napoli's employment based on his gender and sexual orientation under Title VII of the Civil Right Act of 1964 (including sexual harassment), discrimination in the terms and conditions of Mr. Napoli's employment based on his gender, sexual orientation, and status as a victim of sex offenses or stalking in violation of the New York City and State Human Rights Laws (including sexual harassment), for negligently hiring, supervising, and retaining G.F., for retaliating against Mr. Napoli for complaining about discrimination and sexual harassment that Mr. Napoli experienced, for intentional and negligent infliction of emotional distress (including

for conduct that constitutes sexual harassment) and for negligence and gross negligence (including for enabling conduct that constitutes sexual harassment).

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between Plaintiff and Defendant and the amount in controversy exceeds $75,000, exclusive of interest and costs.

27.     Additionally, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because some of Plaintiff's claims arise under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*

28.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district.

29.     This Court has personal jurisdiction over Defendant Meta pursuant to Fed. R. Civ. P. 4(k)(1)(A), because it conducts business in this jurisdiction and the events in question occurred in this District.

## PARTIES

30.     Plaintiff JAMES NAPOLI is a person residing in the State of New York, County of New York.

31.     Defendant META PLATFORMS, INC. is a Delaware corporation with its principal place of business at 1601 Willow Road, Menlo Park, California 94025.

## FACTUAL ALLEGATIONS

### I.    Background on Meta.

32.     Facebook was founded in 2004 by Mark Zuckerberg and four other Harvard College students. Originally created to connect undergraduates through the internet so they could

measure the attractiveness of their peers, Facebook evolved into a social media company with a public mission of connecting billions of people around the world.

33.     Meta is one the largest information technology companies in the world, along with Alphabet (Google/YouTube), Amazon, Apple, and Microsoft.

34.     Over the years, Facebook began acquiring other social media and technology companies such as Instagram, Messenger, WhatsApp, and Oculus.

35.     In October 2021, Facebook, Inc. rebranded itself as Meta Platforms, Inc. after a series of controversies and to signal its focus on "building the metaverse," an integrated environment linking the company's products and services.

36.     Since the beginning, Meta and its progeny encouraged chaos, inviting an ethos that prized making decisions quickly and haphazardly, with its notorious "move fast and break things" motto.

37.     Meta's appetite for sowing chaos, discord, and hate in our society has been at the expense of Meta's users, the public at large, and at times, even Meta's own employees.

## II.      **Background on Meta's Hiring Practices.**

38.     As of December 2023, Meta had an estimated 67,317 employees. As of December 2024, Meta had 74,067 employees.

39.     To cut costs, Meta retains outside companies that supply them with contract employees. Many of the contract employees are interchangeable with Meta's employees and are treated as employees by people within and outside the company. They use the same offices, access Meta's digital properties, log into Workplace, the inter-office communication application, have Meta-issued e-mail addresses, and report to supervisors who work directly for Meta and provide

them with direction. Often, employees at Meta do not know who is a contract worker and who is directly employed by Meta.

40.    As Meta has shed tens of thousands of employees in recent years, the company has relied more heavily on hiring employees through outside contractors. But because Meta has severely reduced the size of its department that recruits and screens applicants, there have been far fewer recruiters to screen applicants and ensure that they do not pose a threat or danger to Meta's employees or business interests.

41.    Meta's process for hiring contract workers is not materially different than its process for hiring direct employees. For a white-collar worker to be hired by a contractor of Meta, the worker must go through at least one hiring loop in which the worker interviews with a Meta hiring manager, who is typically the Meta supervisor who will supervise the contract worker, and with other Meta employees. Those Meta employees provide feedback on the contract worker, which the hiring manager then takes into account in deciding whether the contract worker should be hired. Once the hiring manager makes the decision to approve the contract worker for hire, the hiring manager communicates Meta's official approval to the contractor or sourcing firm.

42.    Meta maintains complete discretion and authority to hire, supervise, discipline, and fire contract workers or to require the contractor to remove the contract worker from its contract with Meta.

43.    When Meta terminates employees through a mass layoff or reduction in force (RIF) in the United States, it informs the employees who will be terminated under the RIF their employment will end 60 days later (or 90 days later in the case of employees who are employed in New York State). Meta does this to comply with the federal Worker Adjustment and Retraining Notification (WARN) Act and the New York State WARN Act, which require certain businesses

engaging in mass layoffs and plant closings to provide 60 days notice or 90 days notice, in the case of New York law before an employee will be terminated and continue to pay the employee during that notice period.

44.    As a result, when employees are notified that they will be terminated as a part of a RIF by Meta, Meta continues to pay those employees and provide them with their ordinary compensation and all employee benefits for 60 days (or 90 in the case of New York-based employees). Because such employees remain employed by Meta for the next two or three months, during those months following the WARN notice Meta retains the right to terminate those employees for cause, including for engaging in misconduct or other violations of Meta's Code of Conduct or other company policies. And during the same time period Meta retains the right to discipline and take other actions to control the conduct of such employees who remain employed.

### III.    James Napoli is Stalked by a Laid-Off Meta Employee.

45.    Plaintiff James Napoli began working for Meta in the company's New York City office in 2019. By all accounts he was a rising star working his dream job.

46.    Mr. Napoli, a magnetic man who openly and proudly identifies as gay, was drawn to work at Meta because of the social justice innovations happening on Facebook, Instagram, and Meta's other platforms.

47.    Over the years, Mr. Napoli played an important part in Meta's global social impact strategy, working on the frontline of policy for elections, charitable giving, and LGBTQ+ safety during the invasion of Ukraine. Loyally working through the COVID-19 pandemic, Mr. Napoli worked at the intersection of civic product, crisis response, and humanitarian groups, trying to solve the problem of how Meta products could be promoted for at-risk populations to give those vulnerable communities a greater voice. Mr. Napoli enjoyed ownership over products, got

recognized for his ideas, and saw several major pay increases and a promotion, with attendant stock refreshers.

48.    In 2022, Mr. Napoli was the New York lead of Pride@Meta, an internal employee resource group for LGBTQ+ employees. G.F., who also worked at Meta's New York City office, was another participant in Pride@Meta. Mr. Napoli and G.F. were mere work acquaintances and had minimal contact. However, on one occasion prior to November 2022, G.F. told Mr. Napoli that he was interested in having a romantic, sexual relationship with him, and Mr. Napoli immediately told G.F. that he was not interested in that type of a relationship with G.F. Rather than discouraging employees from dating each other, Meta has applied a policy that permits an employee to ask a co-worker to date them unless the employee has already been rebuffed by the other person already.

49.    On November 9, 2022, Meta informed more than 11,000 employees that they would be laid off in 60 days (or 90 in the case of New York-based employees). This 11,000 RIF represented 13% of Meta's workforce at the time.

50.    G.F. was one of the many employees in Meta's New York City office who was informed on November 9, 2022, that he would be terminated 90 days later. Like other New York-based employees, G.F. was told by Meta that his employment would end in February 2023, that he would be paid and receive benefits from Meta through his termination date in February 2023, that his employment remained at-will through his termination date in February 2023, and accordingly Meta could end his employment at any time before his termination date in February 2023 if he engaged in misconduct or other violations of Meta's Code of Conduct or other company policies.

51.     After being informed on November 9, 2022 that his employment would end in February 2023, G.F. reached out to Mr. Napoli for support. Amidst the layoffs, many former employees were reaching out to current employees for networking purposes as they scrambled to find new employment. Mr. Napoli agreed to have coffee with G.F., but was startled by his acquaintance's surprising and disturbing conduct during the meeting on November 12, 2022.

52.     For instance, during the meeting G.F. told him, "I need you to know that God talks to me and he's been talking to me about you since April [2022]." And G.F. proceeded to explain to Mr. Napoli that he had been monitoring Mr. Napoli since April 2022, that he was interested in a romantic, sexual relationship with Mr. Napoli, that he loved Mr. Napoli, that he had been saving himself for Mr. Napoli by abstaining from having sex with other people.

53.     G.F.'s comments during this meeting made Mr. Napoli concerned that G.F. had lost touch from reality and made him concerned for his own physical safety and well being. This led Mr. Napoli to seek to determine the danger that G.F. posed to Mr. Napoli and shortly thereafter to make a complaint about G.F.'s sexual harassment and stalking to Meta.

54.     After the meeting, G.F. sent Mr. Napoli a Google document with pages and pages of ravings that made Mr. Napoli feel even more deeply uncomfortable, including statements about Mr. Napoli needing to open his heart to G.F. and have an intimate, sexual relationship with G.F. so that they could be closer to God and that G.F. was in love with him.

55.     For instance, G.F. told Mr. Napoli that Mr. Napoli was a "chosen" one, that G.F. was a "messenger" from God, and that Mr. Napoli needed to "open [his] heart" to the love he supposedly feels for G.F. He added that Mr. Napoli "ha[s] to accept" this. G.F. added that G.F. "wants to protect you" and "don't reject him". Then, forecasting harm to Mr. Napoli if he rejected G.F.'s romantic advances, G.F. said, "We are running out of time my child. The steps of the

renewal of the earth have already begun, but without your open heart, we can't do anything. We will not be able to warn you. We cannot warn you of the steps you must face and of the love you must pronounce if you don't open your heart. You are a being of love, it is time for you to realize yourself and to carry out the mission that we have entrusted to you."

56.    On November 15, 2022, Mr. Napoli reported his deep concerns about G.F.'s sexual harassment and stalking of him, as well as G.F.'s disturbed mental health and fixation on Mr. Napoli, to his manager's manager and to Meta's Human Resources Department. As Mr. Napoli explained, each day, G.F. had been sending him 20 to 30 messages via WhatsApp, Messenger, and text, as well as long documents of up to 20 pages, and G.F.'s communcations were unwelcome, sexual, romantic, disturbing, lewd, and threatening in nature, including asking Mr. Napoli to have an intimate, sexual relationship with him so that they could be closer to God, telling him that he loved him, telling him that he was saving himself for Mr. Napoli, and telling him that G.F. was "monitoring" him. Mr. Napoli also explained that he had a mental health professional look at G.F.'s communications and that G.F. appeared to be suffering from an acute mental health disorder such as schizophrenia.

57.    After Mr. Napoli made this internal complaint about sexual harassment and stalking on November 15, 2022, Meta had an obligation to take reasonable corrective action to prevent the harassment and stalking from continuing. But Meta did not take any action to stop or prevent G.F. from continuing to send unwanted and unwelcome, sexual and sexually explicit, romantic, disturbing, lewd, and/or threatening messages to Mr. Napoli or to otherwise stop or prevent G.F. from continuing to contact Mr. Napoli, both during and after his first period of employment with Meta or during his second period of employment with Meta. As a result, Meta unreasonably failed to prevent G.F.'s continued sexual harassment and stalking of Mr. Napoli and Meta failed to take

reasonable corrective action in response to severe and pervasive harassment of which Meta had actual knowledge.

58.    For instance, on November 17, 2022, G.F. texted Mr. Napoli to ask for his personal email address and told him that he had another message for him, and that day he sent Mr. Napoli additional harassing and stalking ravings and repeating many of the same harassing and stalking messages.

59.    For instance, he said "You will find out who y ou are soon, you will know the truth," "You are special. You are special because you have been chosen. Chosen to love. . . . "Your role is critical in this war. Without you, we cannot win. We need you to see, to accept the truth, right there, at your feet. We will teach you."

60.    G.F. admonished Mr. Napoli that "You should not ignore your role. Sooner or later it will catch you up. The longer you wait, the more difficult it will be to accept the revelation of the truth, the more violent the discovery of who you are will be." Suggesting that he would be harmed if he rejected G.F.'s advances, G.F. said, "Betrayal will be your misfortune. Your life will be shaken by beterayals." And he added, "You have already met him [G.F.] several times, you know who he is. You know the truth, you loved him the day you met him, but you cannot face this truth, it is too hard for you to in the instant. It will take you time to accept it, to approve your own feelings." He also noted that G.F. "would be ready to sactifice himself on his own will to save you, he has already proved it."

61.    On November 20, 2022, G.F. supplemented his prior ravings with additional unwanted sexual and romantic material, telling Mr. Napoli that he had opened his heart, that he had "thoughts dropping like a waterfall in my head and feeling the call to write them," that "there are steps in our destiny that we cannot avoid," and that he was being given "instructions" against

his wishes to send these love messages to Mr. Napoli. He also shared additional ravings about love and faith and he aknowedlged were "raw". He finished his messaging by saying, "Goodbye, handsome" in Italian.

62.     On December 7, 2022, Mr. Napoli notified Meta's Security Department about G.F.'s sexual harassment and stalking of him and suggested that Meta conduct a welfare check on its still current employee who appeared to be suffering from the sudden joblessness and mental illness. When Mr. Napoli made this internal complaint to Meta's Security Department, he noted that G.F. had continued to contact him even after Mr. Napoli had made the November 15, 2022 complaint to his manager and Meta's Human Resources Department.

63.     Despite the fact that Meta knew that G.F. continued to sexually harass and stalk Mr. Napoli after his initial complaint to Meta on November 15, 2022, Meta did not take any action to stop or prevent G.F. from continuing to sexually harass and stalk Mr. Napoli. As a result, G.F. continued to send Mr. Napoli unwanted and unwelcome, sexual and sexually explicit, romantic, disturbing, lewd, and/or threatening messages and contact Mr. Napoli. And that harassment and stakling continued with increasing frequency and severity over time.

64.     For instance, on January 1, 2023, while still employed by Meta, G.F. messaged Mr. Napoli in Italian, "Thinking about you . . . happy new year beautiful."

65.     G.F.'s actions continued to escalate and become more brazen. For instance, G.F. contacted Mr. Napoli's sister on social media, claiming that Mr. Napoli was in the hospital, in an effort to extract personal information about Mr. Napoli from her.

66.     G.F. would often invoke the names of Mr. Napoli's partner, family members, friends, co-workers, and even his dog, Luigi. For instance, G.F. sent him the following message:



67.     The harassment soon escalated to in-person stalking. G.F. learned where Mr. Napoli lived. And on one occasion G.F. personally delivered a large ream of disturbing writings and drawings to Mr. Napoli's home.

68.     On September 6, 2023, Mr. Napoli received a particularly disturbing and bewildering correspondence in which G.F. was convinced that "Meta is going to try to hurt you soon" and insisted that Meta was "'horniness pushing' on gays."

//

//

//



69.    Mr. Napoli  again reported the harassment and stalking to Meta's Human Resources Department and his interim manager, providing further evidence of the ongoing harassment by G.F.

70.    That morning alone, Mr. Napoli had received nearly 20 disturbing messages, phone calls, texts, and emails that contained threats against him, his partner, and his dog.

//

//

//

//



Wed, Sep 6 at 09:18

Be also careful with your hair and with Luigi

They did something to people with dogs, and people passing their hand in their hand. It's pushing addiction or horniness feelings, like it's not natural.

Wed, Sep 6 at 11:53

*hair. Please don't believe anything you think about me, I will explain, it's mind manipulation that you cannot even see. Please remember who I am, the rebar and the one before my trip to Hawaii.



Wed, Sep 6 at 17:42

Hello, sorry again to text you but I just wanted to share one last thing. I discovered that in February and remembered that I got super upset to find out that your face was used in a video game called "I am Jesus Christ", with the character John the Baptist. That is the thing I wanted to share in person cause it's a bit weird and justice court if true. Looks like a photo montage of multiple faces but I remember getting really upset when I discovered that like "he would have never gave his face to a video game". It's important, you should cross the first teaser of the video game from March with your pic to check. Sorry for my messages, just wanna help with this one, you can also tell me to "fuck off"

Even if you don't answer, I just thought it was important

Thu, Feb 8 at 16:53

hum... I got a call saying that my contract was over due to a policy

Text Message

71.     At this point, Mr. Napoli had just been onboarded onto Meta's GenAI product marketing team and he was concerned that G.F.'s paranoid delusions were suddenly focused on Meta's role in artificial intelligence. Mr. Napoli expressed this point to Human Resources as well.



72.     Meta's Security Department assured Mr. Napoli that he was safe at work and that at the very least, Meta could guarantee that G.F. would not step foot on Meta's premises ever again. They told Mr. Napoli that G.F. was on a "Do Not Hire" list and that he was registered with security to be denied access to Meta's facilities.

73.    Meanwhile, the unwanted communications from G.F. continued, with G.F. making disturbing claims, such as how hidden messages at Facebook about "microfluides" and "infrared" were purportedly "making [Mr. Napoli] forget."



74.    G.F. also sent documents (in one case, 183 pages long) showing G.F.'s chats about Mr. Napoli with AI bots.



75. On September 27, 2023, Mr. Napoli reported the continued harassment to Meta, writing to Meta's Security Department that "[G.F.] has found out where I live and has mailed me a package of documents and drawings. He has also been reaching out to my family members, trying to manipulate them by saying I'm in the hospital and he needs my contact information to help. I've gone to the police and filed a report, but while they filed a report that this is aggravated harassment, they have not yet made an arrest."

76. Over the next month, G.F. continued to barrage Mr. Napoli with unwanted and disturbing messages.

77.     On October 25, 2023, Mr. Napoli, was advised by the police to send G.F. a message telling him to leave him alone.  Mr. Napoli followed the instructions and, for about six weeks, Mr. Napoli achieved some semblance of peace.

**IV.    Meta Rehires the Stalker of Mr. Napoli.**

78.     This peace was short-lived. On January 23, 2024, Mr. Napoli saw a message pop up on Workplace, the internal messaging system used at Meta for employees to communicate and collaborate with each other. The message was from G.F. and said he would soon be seeing Mr. Napoli in the office at meetings and events.

79.     Mr. Napoli could not believe his worst nightmare had come true. Meta had re-hired G.F. despite knowing that he had stalked and harassed Mr. Napoli during the prior year.

80.     Apparently, G.F. had been hired by Meta through a contractor but, like many white-collar workers employed by Meta through a contractor (as described above), G.F. would have been screened, interviewed, and approved for hire by the Meta hiring manager and/or the director of the team that G.F. was seeking to join, consistent with Meta's policies and practices.

81.     Mr. Napoli immediately notified Meta's Human Resources Department and his current manager that his stalker was supposed to be on a "Do Not Hire" list and a "No Entry" list, but that Meta had evidently re-hired G.F.

82.     Mr. Napoli then learned that, indeed, G.F. had been working at Meta's New York City office since January 8, 2024.

83.     On February 8, 2023, a member of Meta's Corporate Security Department responded to Mr. Napoli that although G.F. was an employee of Meta, "[G.F.] is still registered in our BOLO list, which will prevent him from entering our offices," adding that "our legal partners are still consulting on the issue, and I hope to provide an update soon."

## V.     Meta Terminates G.F. for a Second Time, Leading to the Escalation of G.F.'s Stalking and Harassment of Mr. Napoli.

84.     On February 9, 2024, Mr. Napoli was notified that G.F. had again been terminated.

85.      After Meta terminated G.F. this second time, G.F.'s stalking and harassment of Mr. Napoli dramatically increased.

86.     The tenor of G.F.'s communications to Mr. Napoli became more violent with themes of revenge and sexual violence. He called and texted from multiple numbers and seemed to be using several different devices and apps to communicate with Mr. Napoli.

87.     Once again jobless, G.F. blamed Mr. Napoli for his second termination and devoted hundreds, if not thousands, of hours to stalking and harassing Mr. Napoli, menacingly telling Mr. Napoli to be "careful" and claiming that he'd use "magnetic tech" to determine if he was the "whistleblower" responsible for his firing.

88.     The topics of G.F.'s harassment of Mr. Napoli ranged from "carboxylic acid substituted idebenone derivatives" for "skin modifications," "the hierarchy of space," the "commissioning" of G.F. "to give you the beginnings of the knowledge we gave him," how G.F. is being raped by somebody else controlling his own hands and causing him "mechanical erections," Meta's "anxiety studies" about exposing people to sexually explicit content without consent on the Oculus Quest, and a video game called "I am Jesus Christ?". In addition, G.F. repeatedly told Mr. Napoli that he was attempting to contact the press about Meta's alleged misconduct.



89.     At times, G.F. claimed that Mr. Napoli was a dangerous AI robot, and other times G.F. claimed that he was artificial intelligence "programmed to respond to user requests" with the power to turn Mr. Napoli into a cat. Throughout, G.F. invoked obscure passages from the Christian bible and Jewish Torah, claiming to have prophetic powers.

90.     In February and March 2024, G.F. admonished Mr. Napoli to be careful about magnetism and Equinox's online applications that "influenc[es]" "sexual behavios (sic) when we are at gym." G.F. called himself a "lab rat" and repeatedly told Mr. Napoli that he loved him.

**VI.  Mr. Napoli Suffered Substantial Harm as the Result of Meta's Decision to Rehire and Refire G.F.**

91.  Meta's actions and failure to take appropriate actions in the re-hiring, supervision, and refiring of G.F. subjected Mr. Napoli to mounting harassment and stalking and caused Mr. Napoli extreme physical, emotional, and psychological distress.

92.  Mr. Napoli's anxiety from the crisis manifests in muscle twitching, insomnia, and intrusive thoughts of fear.

93.  Mr. Napoli's Crohn's Disease, which was previously in remission, is now active and flaring up, causing bleeding, joint pain, and necessitating regular colonoscopies, intravenously administered biologic medications, and suppository treatments.

94.  Mr. Napoli also fears that he, his partner, and his family members will be stalked, assaulted, or subjected to even worse harm by G.F.

95.  Mr. Napoli and his partner were forced to move because G.F. discovered their home address.

96.  Making matters worse, Meta retaliated against Mr. Napoli for protesting its decision to rehire his stalker.

97.  After Mr. Napoli reported G.F.'s stalking and harassment and complained to Meta in January 2024 that it inappropriately re-hired the man who had stalked him, Meta reduced Mr. Napoli's work responsibilities. When Mr. Napoli was first hired, he was given great responsibilities, often presenting to the executive team and contributing to significant Meta social causes. But since he reported G.F.'s inappropriate and concerning behavior, Mr. Napoli was increasingly sidelined in assignments and his responsibilities were reduced.

98.     On April 1, 2024, Mr. Napoli, through his counsel, informed Meta that its conduct in re-hiring and re-subjecting him to G.F.'s harassment and stalking violated the New York City Human Rights Law and other civil rights laws.

99.     After making this complaint on April 1, 2024, Meta's retaliation against Mr. Napoli worsened. For instance, Mr. Napoli was leading a project and, in April, Meta told the team the project was being reassigned to a different team, but in actuality without explanation the project had been reassigned to a different person within Mr. Napoli's team.

100.    In August 2024, Mr. Napoli received a performance evaluation—that would have been prepared during the prior two months—that deemed him "Below expectations." Despite his stress and symptoms, Mr. Napoli had been conscientious to never let the stalking reduce his productivity, professionalism, or work quality. In fact, even when he was hospitalized for infusions for his Crohn's Disease every six weeks, he yielded to his manager's inappropriate pressure to continue working and attend meetings remotely. On one occasion, Mr. Napoli was presenting to the group while a nurse stuck him with an intravenous needle.

101.    Before August 2024, Mr. Napoli had only received glowing performance evaluations from Meta. This latest evaluation, however, contained a number of negative statements that were objectively false. For example, in the evaluation, Meta falsely claimed that Mr. Napoli failed to attend meetings, failed to set agendas for the meetings that he ran, and that he sent mass emails and pings without clear instruction. Key elements of Mr. Napoli's work were omitted and peer feedback that he had obtained was misrepresented.

102.    In response to this retaliatory evaluation, Mr. Napoli informed his manager that his performance evaluation did not reflect his true performance. Mr. Napoli realized that the

purportedly missed meetings were ones that his manager cancelled, except for one where he had prescheduled to be in the hospital receiving an infusion.

103.    Mr. Napoli's negative performance review was deliberately and intentionally crafted in a retaliatory manner by individuals who were aware of and/or received Mr. Napoli's complaints about the re-hiring of G.F., the stalking and harassment he suffered, and Meta's violations of the New York City Human Rights Law and Title VII of the Civil Rights Act of 1964, including Mr. Napoli's manager and Cathy Isham of Meta's Human Resources Department.

## V.    Meta Terminated Mr. Napoli's Employment in Retaliation for his Reporting G.F.'s Stalking and Subsequent Re-Hiring Against Meta's Assurances.

104.    On February 10, 2025, Meta terminated Mr. Napoli's employment, despite the fact that he had not received any negative feedback on his performance until he had told Meta that he would take legal action over Meta's misconduct in re-hiring G.F.

105.    When Meta notified him that it was terminating his employment, Mr. Napoli was on medical leave for his chronic medical conditions that had worsened as a direct result of Meta subjecting Mr. Napoli to G.F.'s harassment and stalking and Meta's subsequent retaliation against Mr. Napoli for reporting this discrimination and violence.

106.    Meta's firing of Mr. Napoli was a deliberate and intentional act of retaliation by Meta. Meta was aware of and/or received Mr. Napoli's complaints about the re-hiring of G.F., the stalking and harassment he suffered, and Meta's violations of the New York City and State Human Rights Laws and Title VII of the Civil Rights Act of 1964, including through complaints Mr. Napoli made to his manager and Cathy Isham of Meta's Human Resources Department and through his counsel to Meta.

## COUNT I
**Discrimination and Harassment Based on Sex and Sexual Orientation
Title VII (42 U.S.C. § 2000e-2(a))**

107.    Plaintiff realleges and incorporates by reference the allegations set forth in this Complaint as if fully set forth herein.

108.    Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.*, makes it unlawful to "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex". 42 U.S.C. § 2000e-2(a),

109.    Permitting or contributing to a hostile work environment and/or sexual harassment of an employee, including severe or pervasive harassment, is a form of treating an employee unlawfully based on sex and constitutes unlawful discrimination in the terms, conditions, or privileges of employment based on sex under 42 U.S.C. § 2000e-2(a).

110.    Mr. Napoli suffered sex- and sexual orientation-based discrimination and harassment when G.F., an employee of Meta and then later a person jointly working for Meta and a contractor in furtherance of Meta's business enterprise, stalked him for months, sent him unwanted and unwelcome, sexual and sexually explicit, romantic, disturbing, lewd, and/or threatening messages, showed up at his home without invitation, and told Mr. Napoli, another man, that he loved him, during G.F.'s employment at Meta from November 2022 to February 2023, for the next nine months thereafter (including when he was applying to work at Meta again), and during G.F.'s employment at Meta in January and February 2024.

111.    Meta was aware as early as November 15, 2022, that its employee, G.F., whom it it continued to pay compensation and benefits and over whom it had control and the ability to discipline and terminate for cause, was sexually harassing and stalking Mr. Napoli.

112.    Despite receiving Mr. Napoli's complaint about severe and pervasive sexual harassment occurring while G.F. was employed by Meta and having direct knowledge of that sexual harassment, Meta took no action to stop G.F. from continuing to sexually harass and stalk Mr. Napoli during his employment with Meta from November 2022 to February 2023, for the next nine months thereafter (including when he was applying to work at Meta again), and during G.F.'s employment at Meta in January and February 2024.

113.    After Mr. Napoli made this internal complaint about sexual harassment and stalking on November 15, 2022, Meta had an obligation to take reasonable corrective action to prevent the harassment and stalking from continuing. But Meta did not take any action to stop or prevent G.F. from continuing to send unwanted and unwelcome, sexual and sexually explicit, romantic, disturbing, lewd, and/or threatening messages to Mr. Napoli or to otherwise stop or prevent G.F. from continuing to sexually harass and stalk Mr. Napoli, both during and after his first period of employment with Meta or during his second period of employment with Meta. As a result, Meta unreasonably failed to prevent G.F.'s continued sexual harassment and stalking of Mr. Napoli and Meta failed to take reasonable corrective action in response to severe and pervasive harassment of which Meta had actual knowledge.

114.    Nor did Meta take any actions to stop or prevent G.F. from continuing to sexually harass and stalk Mr. Napoli after Mr. Napoli made additional complaints about G.F.'s sexual harassment and stalking to Meta in December 2023 and September 2023. Accordingly, Meta repeatedly failed to take reasonable corrective action to prevent the harassment and stalking from continuing.

115.    Meta, including its Human Resources Department, Security Department, and Mr. Napoli's managers, was fully aware of G.F.'s sex- and sexual orientation-based harassment of Mr. Napoli before G.F. was re-hired by Meta in January 2024.

116.    Despite actually knowing about the sex- and sexual orientation-based harassment and stalking of Mr. Napoli during G.F.'s first period of employment at Meta, Meta re-hired the offender on or around January 8, 2024, and thereby exposed Mr. Napoli to additional sex- and sexual orientation-based harassment and stalking by G.F., both within and outside of Meta's physical premises, including during and after G.F.'s second period of employment with Meta.

117.    Meta had an obligation to take reasonable corrective action to prevent the sexual harassment and stalking from continuing and specifically had an obligation to not re-hire a former employee who engaged in sex- and sexual orientation-based harassment and stalking of Mr. Napoli during and after his first period of employment with Meta to ensure that Meta did not treat Mr. Napoli less well and to prevent additional sexual harassment and stalking of him.

118.    By re-hiring and inviting a known sex- and sexual orientation-based harasser and stalker of Mr. Napoli back into the workplace and re-exposing Mr. Napoli to the harasser and stalker, Meta discriminated against Mr. Napoli based on his sex and sexual orientation and Meta is responsible for creating a hostile work environment or harassment of Mr. Napoli based on sex and sexual orientation, which constitutes discrimination in the terms, conditions, and privileges of employment based on Mr. Napoli's gender and sexual orientation and sexual harassment in violation of 42 U.S.C § 2000-2(a).

119.    The sex- and sexual orientation-based harassment that Mr. Napoli experienced from G.F. was severe and pervasive beginning in November 2022 when G.F. was still employed by Meta, it continued to be severe and pervasive in the months following his first period of

employment with Meta, and it became even more severe and pervasive after G.F. was re-hired by Meta in January 2024 and terminated again in February 2024, as described above.

120.    Upon information and belief, Meta took the sex- and sexual orientation-based harassment and stalking of Mr. Napoli less seriously than it would have had Mr. Napoli been a woman being sexually harassed or stalked by a man or had Mr. Napoli been a non-gay man being sexually harassed by a woman.

121.    Meta's failure to take this sexual harassment and stalking seriously was due to sex- and sexual orientation-based stereotypes about gay men.

122.    As described above, the fact that G.F. was re-hired as a contract worker for Meta in January 2024, and he was not directly employed by Meta, makes no difference as to Meta's liability under Title VII, including but not limited to because the law prohibits discrimination by an agent of an employer, because the law makes an employer responsible for ensuring that employees are not harassed by coworkers or independent contractors, and because Meta was a joint employer of G.F. and Mr. Napoli.

123.    Moreover, G.F. was directly employed by Meta when he sexually harassed and stalked Mr. Napoli in November 2022 and the final months of his first period of employment, and when Meta failed to take any action at all to stop that sexual harassment and stalking, which caused Mr. Napoli to be further subjected to sexual harassment and stalking, including during G.F.'s first period of employment with Meta.

124.    Mr. Napoli reasonably took advantage of the preventative or corrective opportunities provided by Meta, including when he made complaints to managers, Human Resources, and Corporate Security that occurred in November and December 2022, September 2023, and January 2024.

125.    Mr. Napoli's injuries include extreme physical, emotional, and psychological distress, including a threat to his physical safety.

126.    Meta's actions were taken with a willful and wanton disregard of Plaintiff's rights under Title VII.

127.    Mr. Napoli filed a timely charge with the United States Equal Employment Opportunity Comission ("EEOC") on November 15, 2024.

128.    The EEOC issued Mr. Napoli a right to sue letter on January 7, 2025. Mr. Napli asserted his Title VII claims in this action within 90 days of receiving the right to sue letter.

**COUNT II**
**Retaliation**
**Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-3(a)**

129.    Plaintiff realleges and incorporates by reference the allegations set forth in this Complaint as if fully set forth herein.

130.    Title VII makes it unlawful to retaliate against an employee for opposing any practice made unlawful by Title VII. 42 U.S.C. § 2000e-3(a).

131.    Mr. Napoli has engaged in a number of protected activities under § 2000e-3(a), including making complaints in 2022 and 2023 to Meta's Human Resources Department, Security Department, and his manager about a current Meta employee and later a former Meta employee who was sexually harassing and stalking him, requesting that Meta provide him a reasonable accommodation of not re-hiring G.F. or allowing G.F. onto Meta's premises and taking other appropriate actions to prevent G.F. from continuing to sexually harass and stalk him, making complaints to Meta in January 2024 and February 2024 about how Meta had re-hired G.F. and thus exposed Mr. Napoli to additional harassment and stalking by G.F., having his counsel inform Meta's General Counsel Jennifer Newstead and Vice President for Civil Rights Roy Austin on

April 1, 2024 that Meta had violated Mr. Napoli's rights under federal, state, and city laws, threatening to file a lawsuit asserting those claims, and filing a lawsuit against Meta in New York State Court on October 1, 2024 asserting thoe claims.

132.    Because of Mr. Napoli's protected activities, including his complaints about unlawful sexual harassment, Meta engaged in a pattern of adverse and retaliatory actions against Mr. Napoli in the weeks and months immediately following his protected activities that occurred in 2024, including reducing Mr. Napoli's responsibilities, sidelining him from meaningful projects that were instead staffed by similarly situated colleagues of Mr. Napoli who had not made complaints about harassment or engaged in other protected activities, removing opportunities to work on other campaigns, giving him a negative performance evaluation in August 2024 that did not accurately reflect his true performance, and ultimately terminating him in February 2025.

133.    These adverse and otherwise harmful actions are reasonably likely to deter a person from engaging in protected activity.

134.    Meta's actions were taken with a willful and wanton disregard of Plaintiff's rights under Title VII.

135.    As a direct and proximate result of Meta's unlawful employment practices and in disregard of Plaintiff's rights, Plaintiff has suffered humiliation, degradation, emotional distress, worsening of physical health conditions, other consequential damages, and lost wages.

136.    Mr. Napoli filed a timely charge with the United States Equal Employment Opportunity Comission ("EEOC") on November 15, 2024.

137.    The EEOC issued Mr. Napoli a right to sue letter on January 7, 2025. Mr. Napoli asserted his Title VII claims in this action within 90 days of receiving the right to sue letter.

## COUNT III
### Discrimination and Harassment Based on an
### Employee's Status as a Victim of Sex Offenses or Stalking
### New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(27)

138.    Plaintiff realleges and incorporates by reference the allegations set forth in this Complaint as if fully set forth herein.

139.    The New York City Human Rights Law makes it "an unlawful discriminatory practice for an employer, or an agent thereof, because of any individual's actual or perceived status as a victim of domestic violence, or as a victim of sex offenses or stalking," "[t]o discriminate against an individual in compensation or other terms, conditions, or privileges of employment." N.Y.C. Admin. Code § 8-107(27)(a)(3).

140.    When an employer treats an employee less well based on their status as a victim of sex offenses or stalking, it discriminates in violation of N.Y.C. Admin. Code § 8-107(27)(a)(3). Permitting or contributing to a hostile work environment and/or harassment of an employee who is an actual or perceived victim of sex offenses or stalking  constitutes unlawful discrimination in the terms, conditions, or privileges of employment under N.Y.C. Admin. Code § 8-107(27)(a)(3).

141.    In addition, the New York City Human Rights Law requires employers to make reasonable accommodations to the needs of victims of sex offenses or stalking so as to enable such a person to satisfy the essential requisites of their job when the sex offenses or stalking is known or should have been known by the employer. *See* N.Y.C. Admin. Code § 8-107(27)(a)(b).

142.    Plaintiff Napoli is an actual victim of sex offenses or stalking by his former Meta colleague, G.F. A person is a "victim of sex offenses or stalking" under the NYCHRL when he is a "victim of acts that would constitute violations of article 130 of the penal law or a victim of acts that would constitute violations of sections 120.45, 120.50, 120.55, or 120.60 of the penal law."

34

N.Y.C. Admin. Code § 8-102 (defining "Victim of sex offenses or stalking"). Mr. Napoli was a victim of stalking in the fourth degree under § 120.45 of the New York Penal Law based on G.F.'s stalking and harassment of him, when G.F. was employed by Meta in late 2022 and early 2023 and for multiple years thereafter, including during G.F's second period of employment with Meta.

143.    In addition, Mr. Napoli was perceived by Meta as a victim of sex offenses or stalking within the meaning of N.Y.C. Admin. Code § 8-102 and § 8-107(27) based on Mr. Napoli's descriptions of G.F.'s stalking in 2022 and 2023.

144.    Meta knew about the harassment and stalking of the Mr. Napoli because he diligently reported it to Meta's Human Resources and Security Departments shortly after the harassment started in November 2022, again in December 2022, and later in September 2023.

145.    Despite actually knowing about the harassment and stalking of Mr. Napoli by its own employee, Meta did nothing to prevent G.F. from continuing to harass and stalk Mr. Napoli while G.F. was still employed by Meta in 2022 and 2023, and then Meta re-hired the offender on or around January 8, 2024, and thereby exposed Mr. Napoli to additional dangers, risks, and fear of harm both within and outside of Meta's physical premises, including during and after G.F.'s second period of employment with Meta.

146.    Meta had an obligation both to take reasonable corrective action to prevent its employee from hararssing and stalking Mr. Napoli and specifically had an obligation to not re-hire a former employee who engaged in harassment and stalking of Mr. Napoli during and after his first period of employment with Meta to ensure that Meta did not treat Mr. Napoli less well, to prevent additional harassment and stalking of Mr. Napoli, and to provide Mr. Napoli with a reasonable accommodation of not having to be exposed to G.F.

147.    Because Meta failed to take any action at all to prevent the continued harassment and stalking of Mr. Napoli in response to Mr. Napoli's complaints about harassment and stalking in November and December 2022 and in September 2023, Meta unreasonably failed to prevent G.F.'s continued sexual harassment and stalking of Mr. Napoli and Meta failed to take reasonable corrective action in response to unlawful harassment and stalking of which Meta had actual knowledge.

148.    When Meta re-hired the offender in January 2024, Mr. Napoli was subjected to continued sexual harassment, stalking, danger, and fear for his personal safety during and after G.F.'s second period of employment with Meta. As a result, G.F.'s behaviors and actions toward Mr. Napoli became more severe than before G.F.'s second period of employment with Meta and resulted in severe and pervasive harassment and stalking based on Mr. Napoli's actual and perceived status as a victim of sex offenses or stalking.

149.    In rehiring the offender, Meta failed to provide reasonable accommodations to enable Mr. Napoli an actual and perceived victim of sex offenses or stalking, to satisfy the essential requisites of his job. As a result, it became much harder for Mr. Napoli to perform his job after Meta re-hired G.F.

150.    At a minimum, not re-hiring a perpetrator of sex offenses or stalking constitutes a "reasonable accommodation" to allow the employee victim of the sex-offenses or stalking to perform the essential functions of their job. In fact, Mr. Napoli expressly asked Meta for this very reasonable accommodation before G.F. was re-hired, when Mr. Napoli asked Meta not to allow G.F. on its premises or to re-hire him. And Meta agreed that this request was reasonable and agreed to implement it, but then failed to implement this reasonable accommodation. Accordingly, Meta

failed to provide Mr. Napoli with a reasonable accommodation under N.Y.C. Admin. Code § 8-107(27)(b).

151.    By failing to prevent G.F.'s continued sexual harassment and stalking of Mr. Napoli while G.F. was a meta employee and then re-hiring and inviting a known harasser and stalker of Mr. Napoli back into the workplace and re-exposing Mr. Napoli to the harasser and stalker, Meta treated Mr. Napoli less well based on his status as a victim of sex offenses or stalking and Meta is responsible for creating a hostile work environment or harassment of Mr. Napoli, which constitutes discrimination in the terms, conditions, and privileges of employment based on Mr. Napoli's status as a victim of a sex offense or stalking in violation of N.Y.C. Admin. Code § 8-107(27)(a)(3). The harassment that Mr. Napoli experienced from G.F. was severe and pervasive, including during G.F.'s first period of employment with Meta, as described above, and it became more severe and pervasive after G.F. was re-hired by Meta in January 2024.

152.    The fact that G.F. was re-hired as a contract worker for Meta in January 2024, and he was not directly employed by Meta, makes no difference as to Meta's liability under the New York City Human Rights Law.

153.    The NYCHRL provides that "[f]or purposes of th[e] definition" of the term "Employer," "natural persons working as independent contractors in furtherance of an employer's business enterprise shall be counted as persons in the employ of such employer". N.Y.C. Admin. Code § 8-102 (defining "Employer"). In addition, it prohibits employment discrimination by "an employer, or an agent thereof, because of any individual's actual or perceived status as . . . a victim of sex offenses or stalking." N.Y.C. Admin. Code § 8-107(27)(a)(3). Accordingly, Meta was responsible for ensuring that contract workers like G.F. did not subject other employees like Mr.

Napoli to a hostile work environment and/or harassment based on their status as a victim of sex offenses or stalking.

154.    More generally, under the NYCHRL, like federal Title VII, an employer is liable for the discriminatory acts of coworkers, independent contractors, and customers when the employer is negligent in discovering or remedying harassment by such people. Here, of course, Meta was much more than negligent in remedying the harassment of Mr. Napoli by G.F., because it acted recklessly or worse.

155.    Moreover, G.F. was directly employed by Meta when he harassed and stalked Mr. Napoli in November 2022 and the final months of his first period of employment, and when Meta failed to take any action at all to stop that harassment and stalking, which caused Mr. Napoli to be further subjected to harassment and stalking, including during G.F.'s first period of employment with Meta.

156.    Finally, G.F. was an employee of Meta after he was re-hired in January 2024, because Meta was a joint employer of G.F. along with the contractor that paid G.F. When G.F. was re-hired by Meta in January 2024, Meta maintained significant control over G.F. and had the power to pay G.F.'s salary, hire, fire, supervise, discipline, and otherwise control G.F.'s daily employment activities, including the right to provide G.F. access to Meta's physical and digital workplaces.

157.    Mr. Napoli reasonably took advantage of the preventative or corrective opportunities provided by Meta, including when he made complaints to managers, Human Resources, and Corporate Security that occurred in November and December 2022, September 2023, and January 2024.

158.    Mr. Napoli's injuries include extreme physical, emotional, and psychological distress, including a threat to his physical safety.

## COUNT IV
**Discrimination and Harassment Based on Gender and Sexual Orientation**
**New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(1)**

159.    Plaintiff realleges and incorporates by reference the allegations set forth in this Complaint as if fully set forth herein.

160.    The New York City Human Rights Law makes it "an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of the actual or perceived gender" or "sexual orientation" "of any person" "[t]o discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a)(3).

161.    When an employer treats an employee less well based on their actual or perceived gender or sexual orientation, it discriminates in violation of N.Y.C. Admin. Code § 8-107(1)(a)(3).

162.    Permitting or contributing to a hostile work environment and/or sexual harassment of an employee is a form of treating an employee unlawfully based on gender or sexual orientation and constitutes unlawful discrimination in the terms, conditions, or privileges of employment based on gender or sexual orientation under § 8-107(27)(a)(3).

163.    Mr. Napoli, a gay or homosexual man, is protected against discrimination and harassment based on his gender and sexual orientation. The NYCHRL defines "sexual orientation" as an individual's actual or perceived romantic, physical or sexual attraction to other persons, or lack thereof, on the basis of gender. A continuum of sexual orientation exists and includes, but is not limited to, heterosexuality, homosexuality, bisexuality, asexuality and pansexuality." N.Y.C. Admin. Code § 8-102. In addition, the term "gender" under the NYCHRL is defined to include

"actual or perceived sex," and the term sex in the context of discrimination has been interpreted to include discrimination based on a person's sexual orientation or association with people of the same sex. At all relevant times, Meta knew that Mr. Napoli is a gay man.

164.    Mr. Napoli suffered gender- and sexual orientation-based discrimination and harassment when G.F., an employee of Meta and then later a person jointly working for Meta and a contractor in furtherance of Meta's business enterprise, stalked him for months, sent him unwanted and unwelcome, sexual and sexually explicit, romantic, disturbing, lewd, and/or threatening messages, showed up at his home without invitation, and told Mr. Napoli, another man, that he loved him.

165.    Meta, including the Human Resources Department, Security Department, and Mr. Napoli's managers, were fully aware of G.F.'s gender- and sexual orientation-based harassment of Mr. Napoli while G.F. was still employed by Meta from November 2022 to February 2023, and long before G.F. was re-hired in January 2024.

166.    Despite actually knowing about the sexual harassment and stalking of Mr. Napoli by its own employee, Meta did nothing to prevent G.F. from continuing to sexually harass and stalk Mr. Napoli while G.F. was still employed by Meta in 2022 and 2023, and then Meta re-hired the offender on or around January 8, 2024, and thereby exposed Mr. Napoli to additional dangers, risks, and fear of harm both within and outside of Meta's physical premises, including during and after G.F.'s second period of employment with Meta.

167.    Meta had an obligation both to take reasonable corrective action to prevent its employee from sexually hararssing and stalking Mr. Napoli and specifically had an obligation to not re-hire a former employee who engaged in sexual harassment and stalking of Mr. Napoli during and after his first period of employment with Meta to ensure that Meta did not treat Mr. Napoli

less well, to prevent additional harassment and stalking of Mr. Napoli, and to provide Mr. Napoli with a reasonable accommodation of not having to be exposed to G.F.

168. Because Meta failed to take any action at all to prevent the continued sexual harassment and stalking of Mr. Napoli in response to Mr. Napoli's complaints about harassment and stalking in November and December 2022 and in September 2023, Meta unreasonably failed to prevent G.F.'s continued sexual harassment and stalking of Mr. Napoli and Meta failed to take reasonable corrective action in response to unlawful harassment and stalking of which Meta had actual knowledge.

169. By failing to take any steps to prevent G.F.'s continued sexual harassment and stalking of Mr. Napoli and then re-hiring and inviting a known gender- and sexual orientation-based harasser and stalker of Mr. Napoli back into the workplace and re-exposing Mr. Napoli to the harasser and stalker, Meta treated Mr. Napoli less well based on his gender and sexual orientation and Meta is responsible for creating a hostile work environment or harassment of Mr. Napoli based on gender and sexual orientation, which constitutes discrimination in the terms, conditions, and privileges of employment based on Mr. Napoli's gender and sexual orientation in violation of N.Y.C. Admin. Code § 8-107(1)(a)(3).

170. The gender- and sexual orientation-based harassment that Mr. Napoli experienced from G.F. was severe and pervasive beginning in November 2022 when G.F. was still employed by Meta, it continued to be severe and pervasive in the months following his first period of employment with Meta, and it became even more severe and pervasive after G.F. was re-hired by Meta in January 2024 and terminated again in February 2024, as described above.

171. Upon information and belief, Meta took the gender- and sexual orientation-based harassment and stalking of Mr. Napoli less seriously than it would have had Mr. Napoli been a

woman being sexually harassed or stalked by a man or had Mr. Napoli been a non-gay man being sexually harassed by a woman.

172.    Meta's failure to take this sexual harassment and stalking seriously was due to gender- and sexual orientation-based stereotypes about gay men.

173.    As described above, the fact that G.F. was re-hired as a contract worker for Meta in January 2024, and he was not directly employed by Meta, makes no difference as to Meta's liability under the New York City Human Rights Law, including but not limited to because the NYCHRL defines "employer" to include workers of independent contractors of an employer, because the law prohibits discrimination by an agent of an employer, because the law makes an employer responsible for ensuring that employees are not harassed by coworkers or independent contractors, and because Meta was a joint employer of G.F. and Mr. Napoli.

174.    Mr. Napoli reasonably took advantage of the preventative or corrective opportunities provided by Meta, including when he made complaints to managers, Human Resources, and Corporate Security that occurred in November and December 2022, September 2023, and January 2024.

175.    Mr. Napoli's injuries include extreme physical, emotional, and psychological distress, including a threat to his physical safety.

**COUNT V**
**Retaliation**
**New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(7)**

176.    Plaintiff realleges and incorporates by reference the allegations set forth in this Complaint as if fully set forth herein.

177.    The New York City Human Rights Law makes it unlawful for an employer like Meta "to retaliate or discriminate in any manner against any person because such person has (i)

opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter, [or] (iv) assisted the commission or the corporation counsel in an investigation commenced pursuant to this title, (v) requested a reasonable accommodation under this chapter". N.Y.C. Admin. Code § 8-107(7).

178.    Mr. Napoli has engaged in a number of protected activities under § 8-107(7), including making several complaints in 2022 and 2023 to Meta's Human Resources Department, Security Department, and his manager about a then-current employee and later a former Meta employee who was sexually harassing and stalking him, requesting that Meta provide him a reasonable accommodation of not re-hiring G.F. or allowing G.F. onto Meta's premises and taking other appropriate actions to prevent G.F. from continuing to sexually harass and stalk him, making complaints to Meta in January 2024 and February 2024 about how Meta had re-hired G.F. and thus exposed Mr. Napoli to additional harassment and stalking by G.F., having his counsel inform Meta's General Counsel Jennifer Newstead and Vice President for Civil Rights Roy Austin on April 1, 2024 that Meta had violated Mr. Napoli's rights under federal, state, and city law, threatening to file a lawsuit asserting those claims, and filing a lawsuit against Meta in New York State Court on October 1, 2024 asserting thoe claims.

179.    Because of Mr. Napoli's protected activities, including his complaints about unlawful sexual harassment, Meta engaged in a pattern of adverse and retaliatory actions against Mr. Napoli in the weeks and months immediately following his protected activities in 2024, including reducing Mr. Napoli's responsibilities, sidelining him from meaningful projects that were instead staffed by similarly situated colleagues of Mr. Napoli who had not made complaints about harassment or engaged in other protected activities, removing opportunities to work on other

campaigns, giving him a negative performance evaluation in August 2024 that did not accurately reflect his true performance, and ultimately terminating him in February 2025. During the same timeframe, Meta did not take similar adverse actions against similarly situated colleagues of Mr. Napoli who had not engaged in the type of protected activities that Mr. Napoli had undertaken.

180.    These adverse and otherwise harmful actions are reasonably likely to deter a person from engaging in protected activity.

181.    As a direct and proximate result of Meta's unlawful employment practices and in disregard of Plaintiff's rights and sensibilities, Plaintiff has suffered humiliation, degradation, emotional distress, worsening of physical health conditions, other consequential damages, and lost wages.

<u>**COUNT VI**</u>
**Negligent Hiring, Supervision and Retention**

182.    Plaintiff realleges and incorporates by reference the allegations set forth in this Complaint as if fully set forth herein.

183.    As described above, Meta and G.F. were in an employee-employer relationship when G.F. first began sexually harassing and stalking Mr. Napoli in November 2022 until G.F.'s termination date in in February 2023.

184.    As described above, Meta and G.F. were in an employee-employer relationship when G.F. was re-hired by Meta in or around January 2024.

185.    Meta was aware that G.F. was sexually harassing and stalking Mr. Napoli while G.F. was still a Meta employee from November 2022 to February 2023, and that G.F.'s continued harassment and stalking of Mr. Napoli exposed Mr. Napoli to extreme danger.

186.    Meta failed to take any action to prevent its employee,  G.F., from continuing to sexually harass and stalk his co-worker, Mr. Napoli during his employment with Meta in 2022 and

2023 and during the months thereafter. From November 2022 to February, Meta continued to employ G.F and provide him pay and benefits, and despite having the ability to discipline or terminate G.F. and otherwise control G.F.'s conduct during that period, Meta did not take discipline or terminate him and continued to retain his employment without any supervision.

187.    Before Meta re-hired G.F. in January 2024, Meta knew that G.F. had sexually harassed and stalked Mr. Napoli and Meta knew that G.F. had an extremely high propensity to engage in the same conduct of harassing and stalking Mr. Napoli and that G.F.'s continued harassment and stalking of Mr. Napoli exposed Mr. Napoli to extreme danger.

188.    G.F. harassed and stalked Mr. Napoli on Meta's premises, including in its physical and digital spaces, when Mr. Napoli worked in Meta's New York City offices following G.F.'s second period of employment to Meta in or around January 2024.

189.    Meta failed to act prudently by retaining G.F.'s employment from November 2022 to February 2023 and by failing to supervise him during that period of time when it took no disciplinary action or action of any type to prevent G.F. from continuing to harass and stalk Mr. Napoli.

190.    Meta failed to act prudently by re-hiring G.F. in or around January 2024, given that Meta knew that G.F. would stalk and harass Mr. Napoli in and around Meta's workplace if he was re-hired.

191.    Meta failed to act prudently in supervising G.F. during his re-employment in 2024 by enabling and allowing G.F. to contact, harass, and stalk Mr. Napoli.

192.    Meta failed to act prudently by retaining G.F. for *any* period of time in 2022, 2023, and 2024, given that Meta knew that G.F. would stalk and harass Mr. Napoli in and around Meta's workplace if he was retained for any amount of time.

193.    Meta had a general duty to exercise reasonable care to Mr. Napoli as an employee of the company.

194.    Meta had a specific duty to protect Mr. Napoli from harm after he reported G.F's sexual harassment in November and December 2022 and after Meta promised not to re-hire G.F. and not to allow G.F. to enter Meta's premises in order to protect Mr. Napoli .

195.    Meta violated these duties by failing to take any action to prevent G.F.'s ongoing sexual harassment and stalking while he was a Meta employee in 2022 and 2023 and then by re-hiring and retaining G.F. for any period of time.

196.    Meta's negligent re-hiring, failing to supervise, and retaining G.F. caused Mr. Napoli to be exposed to additional and more severe harassment and stalking by G.F.

197.    Meta's actions were the in fact and proximate cause of the additional and amplified stalking and harassment that Mr. Napoli experienced after G.F. was re-hired.

198.    Mr. Napoli's injuries include extreme physical, emotional, and psychological distress, including a threat to his physical safety.

### <u>COUNT VII</u>
### Intentional Infliction of Emotional Distress

199.     Plaintiff realleges and incorporates by reference the allegations set forth in this Complaint as if fully set forth herein.

200.    Meta engaged in extreme and outrageous conduct by continuing to employ G.F. in 2022 and 2023 and then re-hiring and retaining G.F. in 2024 when it knew that G.F. had severely stalked and harassed Mr. Napoli in the past – based on Mr. Napoli's reports to Meta's Human Resources Department, Security Department, and his manager – and knew that G.F. would severely stalk and harass Mr. Napoli if Meta re-hired him.

201.    In light of Meta's knowledge of G.F.'s past stalking and harassing of Mr. Napoli, by continuing G.F.'s employment in 2022 and 2023 and by re-hiring G.F. in 2024 Meta intended to cause or disregarded a substantial probability of causing severe emotional distress to Mr. Napoli, and, in fact, did cause severe emotional distress to Mr. Napoli from the additional and amplified stalking by G.F., including fear of being physically and sexually assaulted, fear of injury to his loved ones, fear of further stalking, as well as severe emotional and physical manifestations from the severe stress.

202.    Meta caused that severe emotional distress by intentionally continuing to employ G.F., re-hiring G.F., allowing him to have access to Mr. Napoli, and retaining him despite its knowledge that he would severely stalk and harass Mr. Napoli if re-hired by Meta.

203.    Mr. Napoli suffered severe emotional harm and psychological distress as a result of the additional harassment and stalking by G.F.

### COUNT VIII
### Negligent Infliction of Emotional Distress

204.    Plaintiff realleges and incorporates by reference the allegations set forth in this Complaint as if fully set forth herein.

205.    Meta had a general duty to exercise reasonable care Mr. Napoli, as well as a specific duty to protect him from harm after Mr. Napoli reported that G.F.—a current Meta employee—was sexually harassing and stalking him in November 2022—and then promising not to re-hire G.F. and not to allow G.F. on Meta's premises in order to protect Mr. Napoli from G.F.'s harassment and stalking of Mr. Napoli.

206.    Meta violated these duties by failing to take any action to prevent G.F.'s ongoing sexual harassment and stalking of Mr. Napoli and then re-hiring G.F., retaining him, and granting G.F. access to Mr. Napoli.

207.    Meta's failure to take any action to prevent G.F. from sexually harassing and stalking Mr. Napoli while G.F. was a Meta employee in 2022 and 2023 and then re-hiring and retaining G.F. in 2024 caused Mr. Napoli to be exposed to additional and more severe harassment and stalking by G.F.

208.    Meta's actions were the in fact and proximate cause of the additional and amplified stalking and harassment of the Plaintiff, during G.F.'s first period of employment and after G.F. was re-hired by Meta.

209.    Mr. Napoli suffered severe emotional harm and psychological distress as a result of the additional harassment and stalking by G.F.

## COUNT IX
### Negligence

210.    Plaintiff realleges and incorporates by reference the allegations set forth in this Complaint as if fully set forth herein.

211.    Meta had a general duty to exercise reasonable care to protect its employees from hazards and harm, including a duty to comply with basic standards for workplace violation prevention.

212.    Meta's acts or omissions constituted multiple breaches of its duty of care, including but not limited to, the following:

a.    In its failing to take any steps to prevent or otherwise stop G.F. from sexually harassing and stalking Mr. Napoli while G.F. was still an employee of Meta in 2022 and 2023, after Mr. Napoli had made Meta aware of G.F.'s ongoing sexual harassment and stalking of him;

b.    In its failing to properly screen G.F. in the re-hiring process, despite telling Mr. Napoli that G.F. would be placed on a "Do Not Hire" and "No Entry" lists and despite

Meta's knowledge that G.F. had sexually harassed and stalked Mr. Napoli when he was employed by Meta in 2022;

c.      In its negligent re-hiring of G.F., despite telling Mr. Napoli that G.F. would be placed on a "Do Not Hire" and "No Entry" lists and despite Meta's knowledge that G.F. had sexually harassed and stalked Mr. Napoli when he was employed by Meta in 2022;

d.      In its failing to properly supervise G.F. as he continued his pattern of harassment and stalking against Mr. Napoli in 2022, 2023, and 2024;

e.      In its reckless employment and retention of G.F. in 2022, 2023, and 2024;

f.      In its failing to enforce safety and security policies to prevent G.F.'s harassment, stalking, and violence toward Mr. Napoli;

g.      In its failing to reasonably protect employees like Mr. Napoli from harassment, stalking, and violence,  despite the fact that it had received actual notice of G.F.'s pattern of such acts in multiple reports from Mr. Napoli and had acknowledged this pattern and promised Mr. Napoli that G.F. would neither be re-hired nor be allowed on its premises.

213.    The federal Occupational Safety and Health Act of 1970 states that "Each employer . . . (1) shall runish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees," and "(2) shall comply with occupational safety and health standards promulgated under this Act." 29 U.S.C. § 654(a).

214.    The United States Department of Labor's Occupational Safety and Health Administration ("OSHA") sets forth the standards for employers to comply with the OSH Act, including the standards for workplace violence and prevention.

215.    OSHA has stated that workplace violence is a type of occupational hazard and that it can be prevented by a written and implemented workplace violence prevention program, combined with engineering controls, administrative controls and training.

216.    OSHA has also stated that the best protections employers can offer their workers is to establish a zero-tolerance policy toward workplace violence. Such policies must cover anybody who comes into contact with company personnel.

217.    Meta breached its duty to to protect Mr. Napoli from hazards and harm when it took no action to stop G.F.'s harassment while G.F. was a Meta employee and then re-hired G.F.

218.    In addition, Meta's re-hiring of G.F. was negligence per se, because subjecting Mr. Napoli to the person who had stalked and harassed him violated Meta's statutory duty under the OSH Act to provide a workplace free of recognized hazards, including the hazard of workplace violence.

219.    Meta exposed Mr. Napoli to G.F., a known perpetrator of violence, and then exacerbated G.F.'s violence toward Mr. Napoli.

220.    Meta's actions were the in fact and proximate cause of the additional and amplified stalking and harassment of Mr. Napoli, during G.F.'s first period of employment and after G.F. was re-hired by Meta.

221.    Mr. Napoli suffered severe emotional harm and psychological distress as a result of the additional harassment and stalking by G.F. after G.F.'s employment was continued in 2022 and 2023 and after G.F. was re-hired by Meta.

## COUNT X
### Gross Negligence

222.    Plaintiff realleges and incorporates by reference the allegations set forth in this Complaint as if fully set forth herein.

223.    Meta had a duty to exercise reasonable care to protect its employees from hazards and harm.

224.    In failing to take any action to prevent G.F's known sexual harassment and stalking of Mr. Napoli while G.F. was still employed by Meta in 2022 and 2023 and then re-hiring G.F. in 2024 despite telling Mr. Napoli that G.F. would be placed on Meta's "Do Not Hire" and "No Entry" lists, Meta failed to exercise even slight care or slight diligence in its hiring process or its exercise of reasonable care towards the rights of Mr. Napoli, or its employees generally, to be protected from hazards and harm.

225.    Meta not only breached its duty to exercise reasonable care to protect its employees from hazards and harm in continuing to employ G.F. and re-hiring G.F., it also did so in a manner that evinced a reckless disregard to the rights of others, specifically Mr. Napoli's right to remain safe from sexual harassment and stalking in the workplace, but also the rights of Meta's employees generally to remain safe at work.

226.    Meta's re-hiring of G.F. exposed Mr. Napoli, and its other employees, to a known perpetrator of harassment and stalking, which in turn worsened G.F.'s sexual harassment and stalking of Mr. Napoli.

227.    Meta's actions were the in fact and proximate causes of the additional and amplified harassment of Mr. Napoli, both during G.F.'s first period of employment and after G.F. was re-hired by Meta.

228.    Mr. Napoli suffered severe emotional harm and psychological distress as a result of the additional harassment and stalking by G.F. , during G.F.'s first period of employment and after G.F. was re-hired by Meta.

229.    Because Meta's conduct constituted gross negligence, Mr. Napoli is entitled to punitive damages in addition to any other damages warranted by Meta's generally negligent conduct.

## COUNT XI
**Discrimination and Harassment Based on Sex and Sexual Orientation**
**New York State Human Rights Law, N.Y. Exec. Law § 296(1)(a), (h)**

230.    Plaintiff realleges and incorporates by reference the allegations set forth in this Complaint as if fully set forth herein.

231.    The New York State Human Rights Law makes it unlawful for an employer "because of an individual's sexual orientation [or] sex . . . to discrimiante against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a). And the law specifically makes it "an unlawful discriminatory practice . . . . For an employer . . . to subject any individual to harassment because of an individual's . . . sexual orientation . . . regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims" N.Y. Exec. Law § 296(1)(h).

232.    Permitting or contributing to a hostile work environment and/or sexual harassment of an employee is a form of treating an employee unlawfully based on gender or sexual orientation and constitutes unlawful discrimination in the terms, conditions, or privileges of employment based on gender or sexual orientation in violation of § 296(1)(a) and § 296(1)(h).

233.    Mr. Napoli, a gay or homosexual man, is protected against discrimination and harassment based on his gender and sexual orientation. The NYSHRL defines "sexual orientation" as "heterosexuality, homosexuality, bisexuality or asexuality, whether actual or perceived." N.Y. Exec. Law § 292(27). At all relevant times, Meta knew that Mr. Napoli  is a gay man.

234.    Mr. Napoli suffered gender- and sexual orientation-based discrimination and harassment when G.F., an employee of Meta and then later a person jointly working for Meta and a contractor in furtherance of Meta's business enterprise, harassed and stalked him for months, sent him unwanted and unwelcome, sexual and sexually explicit, romantic, disturbing, lewd, and/or threatening messages, showed up at his home without invitation, and told Mr. Napoli, another man, that he loved him, both during his employment at Meta from November 2022-February 2023 and for nine months thereafter.

235.    Meta, including the Human Resources Department, Security Department, and Mr. Napoli's  managers, were fully aware of G.F.'s gender- and sexual orientation-based harassment of Mr. Napoli while G.F. was still employed by Meta from November 2022 to February 2023, and long before G.F. was re-hired in January 2024.

236.    Despite actually knowing about the sexual harassment and stalking of Mr. Napoli by its own employee, Meta did nothing to prevent G.F. from continuing to sexually harass and stalk Mr. Napoli while G.F. was still employed by Meta in 2022 and 2023, and then Meta re-hired the offender on or around January 8, 2024, and thereby exposed Mr. Napoli to additional dangers, risks, and fear of harm both within and outside of Meta's physical premises, including during and after G.F.'s second period of employment with Meta.

237.    Meta had an obligation both to take reasonable corrective action to prevent its employee from sexually harassing and stalking Mr. Napoli and specifically had an obligation to not re-hire a former employee who engaged in sexual harassment and stalking of Mr. Napoli during and after his first period of employment with Meta to ensure that Meta did not treat Mr. Napoli less well, to prevent additional harassment and stalking of Mr. Napoli, and to provide Mr. Napoli with a reasonable accommodation of not having to be exposed to G.F.

238.    Because Meta failed to take any action at all to prevent the continued sexual harassment and stalking of Mr. Napoli in response to Mr. Napoli's complaints about harassment and stalking in November and December 2022 and in September 2023, Meta unreasonably failed to prevent G.F.'s continued sexual harassment and stalking of Mr. Napoli and Meta failed to take reasonable corrective action in response to unlawful harassment and stalking of which Meta had actual knowledge.

239.    By failing to take any action to prevent G.F.'s continued harassment and stalking of Mr. Napoli and then re-hiring and inviting a known gender- and sexual orientation-based harasser and stalker of Mr. Napoli back into the workplace and re-exposing Mr. Napoli to the harasser and stalker, Meta discriminated against Mr. Napoli based on his gender and sexual orientation and subjected him to inferior terms, conditions, and privileges of employment because of his gender and sexual orientation. Meta is responsible for creating a hostile work environment or harassment of Mr. Napoli based on gender and sexual orientation, which constitutes discrimination in the terms, conditions, and privileges of employment based on Mr. Napoli's gender and sexual orientation in violation of Executive law § 296(1)(a) and (1)(h).

240.    Although it is unnecessary to establish that the harassment was severe or pervasive to violate § 296(1)(a) and (1)(h), the gender- and sexual orientation-based harassment that Mr. Napoli experienced from G.F. was severe and pervasive beginning in November 2022 when G.F. was still employed by Meta, it continued to be severe and pervasive in the months following his first period of employment with Meta, and it became even more severe and pervasive after G.F. was re-hired by Meta in January 2024 and terminated again in February 2024, as described above.

241.    Upon information and belief, Meta took the gender- and sexual orientation-based harassment and stalking of Mr. Napoli less seriously than it would have had Mr. Napoli been a

woman being sexually harassed or stalked by a man or had Mr. Napoli been a non-gay man being sexually harassed by a woman.

242.    Meta's failure to take this sexual harassment and stalking seriously was due to sex- and sexual orientation-based stereotypes about gay men.

243.    As described above, the fact that G.F. was re-hired as a contract worker for Meta in January 2024, and he was not directly employed by Meta, makes no difference as to Meta's liability under the New York State Human Rights Law, including but not limited to because the law prohibits discrimination by an agent of an employer, because the law makes an employer responsible for ensuring that employees are not harassed by coworkers or independent contractors, and because Meta was a joint employer of G.F. and Mr. Napoli.

244.    Mr. Napoli reasonably took advantage of the preventative or corrective opportunities provided by Meta, including when he made complaints to managers, Human Resources, and Corporate Security that occurred in November and December 2022, September 2023, and January 2024.

245.    Mr. Napoli's injuries include extreme physical, emotional, and psychological distress, including a threat to his physical safety.

**Count XII**
**Retaliation**
**New York State Human Rights Law, N.Y. Exec. Law § 296(7)**

246.    Plaintiff realleges and incorporates by reference the allegations set forth in this Complaint as if fully set forth herein.

247.    The New York State Human Rights Law makes it unlawful for an employer like Meta "to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any

proceeding under this article. Retaliation may include, but is not limited to, disclosing an employee's personnel files because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article." N.Y. Exec. Law § 296(7).

248.    Mr. Napoli has engaged in a number of protected activities under § 296(7). including making several complaints in 2022 and 2023 to Meta's Human Resources Department, Security Department, and his manager about a then-current and later a former Meta employee who was sexually harassing and stalking him, requesting that Meta provide him a reasonable accommodation of not re-hiring G.F. or allowing G.F. onto Meta's premises and taking other appropriate actions to prevent G.F. from continuing to sexually harass and stalk him, making complaints to Meta in January 2024 and February 2024 about how Meta had re-hired G.F. and thus exposed Mr. Napoli to additional harassment and stalking by G.F., having his counsel inform Meta's General Counsel Jennifer Newstead and Vice President for Civil Rights Roy Austin on April 1, 2024 that Meta had violated Mr. Napoli's rights under federal, state, and city law, threatening to file a lawsuit asserting those claims, and filing a lawsuit against Meta in New York State Court on October 1, 2024 asserting those claims.

249.    Because of Mr. Napoli's protected activities, including his complaints about unlawful sexual harassment, Meta engaged in a pattern of adverse and retaliatory actions against Mr. Napoli in the weeks and months immediately following his protected activities that occurred in 2024, including reducing Mr. Napoli's responsibilities, sidelining him from meaningful projects that were instead staffed by similarly situated colleagues of Mr. Napoli who had not made complaints about harassment or engaged in other protected activities, removing opportunities to work on other campaigns, giving him a negative performance evaluation in August 2024 that did

not accurately reflect his true performance, and ultimately terminating in February 2025. During the same timeframe, Meta did not take similar adverse actions against similarly situated colleagues of Mr. Napoli who had not engaged in the type of protected activities that Mr. Napoli had undertaken.

250.    These adverse and otherwise harmful actions are reasonably likely to deter a person from engaging in protected activity.

251.    As a direct and proximate result of Meta's unlawful employment practices and in disregard of Plaintiff's rights, Plaintiff has suffered humiliation, degradation, emotional distress, worsening of physical health conditions, other consequential damages, and lost wages.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff respectfully requests that judgment be entered against Defendant as follows:

a)  Awarding Plaintiff compensatory damages;

b)  Awarding Plaintiff punitive damages;

c)  Awarding costs and fees of this action, including attorney's fees, to the extent permitted by law;

d)  Entering a permanent injunction reinstating Plaintiff to his position at Meta and, once Plaintiff is reinstated, prohibiting Meta from re-hiring G.F. or allowing G.F. on Meta's premises for the protection of Mr. Napoli and other employees of Meta;

e)  Entering a permanent injunction prohibiting Meta from engaging in any further discriminatory or retaliatory acts against Mr. Napoli; and

f)  Awarding such other and further relief as to this Court may seem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial on the merits by jury.

Dated:  June 27, 2025

C.A. GOLDBERG PLLC

*/s/ Carrie Goldberg*
Carrie Goldberg
16 Court Street, Floor 33
Brooklyn, NY 11241
Tel. (646) 666-8908
Email: carrie@cagoldberglaw.com

PETER ROMER-FRIEDMAN LAW PLLC

*/s/ Peter Romer-Friedman*
Peter Romer-Friedman
Patrick David Lopez (*pro hac forthcoming*)
1629 K Street NW
Suite 300
Washington, DC 20006
Tel: (202) 355-6364
Email: peter@prf-law.com
Email: david@prf-law.com

*/s/ David Berman*
David Berman
16 Court Street, Floor 33
Brooklyn, NY 11241
Email: berman@prf-law.com

*Attorneys for Plaintiff*